Argued January 10, affirmed February 8, 1978

WAMPLER et ux, *Respondents,*
*v.*
SHERWOOD et ux, *Appellants.*
(TC 75-2791, SC 25070)
574 P2d 319

Jack A. Gardner, of Gardner, Honsowetz & Johnson, Eugene, argued the cause and filed the briefs for appellants.

Donald Bick, of Bick & Monte, Eugene, argued the cause and filed the brief for respondents.

Before Denecke, Chief Justice, and Tongue and Linde, Justices, and Richardson, Justice Pro Tempore.

TONGUE, J.

**TONGUE, J.**

This is an action for timber trespass. The case was tried before a jury, which returned a verdict in favor of plaintiffs, assessed damages in the sum of $10,078.03 and, in response to a special interrogatory, found that the actions of the defendants were willful. Judgment was then entered against defendants Sherwood for $25,734.09, representing treble damages, less an offset for amounts recovered from other defendants. Defendants Sherwood appeal. We affirm.

Defendants' principal assignment of error is that the trial court erred in denying defendants' motions for nonsuit, directed verdict and judgment n.o.v. because the evidence was insufficient to establish a boundary line by "acquiescence" or "practical location."[1]

Because this is an action at law, and because of Art VII (Amended) § 3 of the Oregon Constitution, we must affirm the verdict of the jury if there is any evidence to support it. Also, in determining whether there is any evidence to support the verdict, we must view the evidence in the light most favorable to the plaintiffs and give them the benefit of all conflicts in the evidence and of all inferences which the jury could reasonably have drawn from the evidence.[2] Viewed in that light, the jury could have found that the facts were as follows.

The property involved in this case is near Florence, in Lane County. The area in dispute is hilly and covered with trees. The property north of the disputed boundary line had been owned for some 60 years by Kenneth McCornack, who sold it to defendants in 1971. The property to the south of that line was owned since 1951 by Herbert Houghton, who sold it to plaintiffs in 1969.

---

[1] An additional ground for this assignment of error is that the evidence was insufficient to establish the validity of a survey relied upon by plaintiffs. Because of the basis upon which we decide this case it becomes unnecessary to consider that question.

[2] *See Cronn v. Fisher,* 245 Or 407, 416, 422 P2d 276 (1966).

[ 263 ]

Mr. McCornack testified that "in the middle 50's sometime" he had a survey of the south line of his property made by William Brayton, a surveyor, because he wanted to sell some timber and "I wanted to know where my line was." He assisted with the survey "as a chainman and he [Brayton] running the transit." He testified that the line ran eastward from a large spruce tree near the county road; that the spruce tree was the only "monument" on the line; that survey stakes were "put out" along the line, but that no "monument" was set at the west end of the line. Mr. McCornack also testified that he relied upon that survey in that he "went ahead and logged up to my line," starting some 300 to 400 feet west of the spruce tree and extending "nearly the full length of my ownership" and that there was then a "clearly visible cutting line."

Mr. Houghton testified that when he bought the land to the south of that line in 1951 "it was a known fact that the spruce tree had been honored as the boundary line for a number of years" and that he was also told at that time by Mr. McCornack that "he had honored the tree as the boundary" and that it was while he owned the property that Mr. McCornack did "a lot of logging there" north of that line for a "number of years" and never disputed that the line ran through the spruce tree.

Mr. Houghton also testified that in about 1957 the Ross brothers wanted to log along the west side of his property and wanted to "establish a cutting line" along that "boundary"; that, as a result, surveyor Brayton was again engaged; that the survey work was done by Brayton, the Ross brothers and himself and that a large cedar stake was then set at the northwest corner of his property. He also testified that Mr. Brayton then showed him where the north line of his property "came out" at the spruce tree. According to Mr. McCornack, Mr. Houghton then told him that "his [Houghton's] survey and my survey [the previous Brayton survey]

[ 264 ]

were the same" and that "his [Houghton's] line and yours [McCornack's] were the same."

The Ross brothers in 1957 logged the timber west of the west line of Houghton's property "right up to the boundary," leaving a visible "corner," when taken together with the logging by Mr. McCornack along the north line of the Houghton property. Mr. Houghton also testified that he relied upon that line as the north boundary of his property in building a mill on his property some distance to the south of that line in 1951. In 1969 Mr. Houghton sold his property to plaintiffs Wampler. Mr. Houghton testified that he then told plaintiffs "just exactly what Brayton had indicated to me where the boundaries were." Mr. McCornack also testified that when plaintiffs bought the property they came to him and "asked where my survey line was" and he "told him that spruce tree by the road was where the survey line was."

Mr. Wampler also testifed that when he purchased the property from Mr. Houghton he went to see Mr. McCornack "because he had the line surveyed" and that "we went down there and talked about it and he said it was straight through the spruce tree" and "verified" what Mr. Houghton had told him about the location of that line. Mr. Wampler also testified that the spruce tree was marked with an old surveyor's "blaze"; that he and Mr. Houghton also went to the northwest corner of the property and could not find the cedar stake; that there had been a slide in that area, causing him to suspect that the cedar post had been "wiped out," but that at that time "you could stand and look at this from anywhere and see that there was a square corner of timber there that had never been logged."

In 1971 Mr. McCornack sold his property to defendants. Defendant Hugh Sherwood was a real estate broker and bought the property to log the timber on it and later have it subdivided for residential purposes.

[ 265 ]

Mr. McCornack testified that at that time Mr. Sherwood "asked me where my survey line was" for the south line of the property; that they then went "down the road," and that he "pointed out this spruce tree" to Mr. Sherwood and told him "that's where the line crossed."

Defendant Sherwood then hired Mr. Robert Manseth, a surveyor, to survey the south line of the property. Mr. Manseth was unable to find one of the monuments described in the original government survey of that section of land, made in 1878. As a result, he located that corner by a practice known to surveyors as "proportionment," based upon measurements from other monuments found by him. He then proceeded to survey the south line and found it to be approximately 120 feet south of the Brayton line and the spruce tree and running through the mill built by Mr. Houghton. He conceded that the accuracy of his survey rested upon the monuments which he was able to find. It does not appear whether in the "middle 50's" Mr. Brayton found the monument which Mr. Manseth was unable to find in 1971.

Mr. Sherwood then went to see Mr. Wampler and informed him of the results of the Manseth survey. Mr. Wampler was understandably "upset." The two of them then went to see Mr. McCornack, who again said that the line went through the spruce tree, rather than 120 feet farther south, as under the Manseth survey, and said (speaking of the "Brayton line") that "he had run it as a chainman for Brayton. And as far as he was concerned that had been the true monument for years, and that all the neighbors had agreed to it for a good number of years. Everybody cut timber according to the Brayton survey."

Mr. Sherwood then gave instructions to the logger to cut timber as far south as the "Manseth line" and said that he would "stand back" of the Manseth survey. Mr. Wampler then filed this action.

At the conclusion of the testimony, and at a conference between the court and counsel, the requirements for proof of the establishment of a boundary by "acquiescence" or "practical location," were discussed, as stated in *Harris et ux v. Backus et al,* 212 Or 695, 321 P2d 315 (1958). Agreement was then reached that this issue be submitted to the jury under the following instruction, to which neither party took exception:

> "An oral agreement between owners of adjoining tracts of land fixing a dividing boundary, the location of which was honestly disputed, or was indefinite or uncertain, becomes enforceable when the agreed boundary, for a period of 10 years or more, has been marked or has been recognized in the subsequent use of the tracts, or when other action has been taken by either party in reliance on the agreement."

Although appellants in their brief on this appeal also cite other cases and authorities and would state these requirements in a somewhat different manner, we believe that the rule as stated in this instruction, to which both parties agreed, became binding upon both of them as the "law of the case."[3] Upon examination of the record, we also believe that there was evidence in this case from which the jury could have properly found that the requirements of the rule as stated in that instruction were satisfied.

First of all, there was evidence from which the jury could have found from the conduct of Mr. McCornack and Mr. Houghton and from the conversations between them, as previously described, that there was an implied oral agreement between them for a period of over 10 years to the effect that the dividing boundary line between their lands was a line running west from the large spruce tree near the county road and along the cutting line to which Mr. McCornack had logged.

Although there may have been no express agreement to that effect, defendants concede that such an

---

[3] *See Fulton Ins. v. White Motor Corp.,* 261 Or 206, 223 n.5, 493 P2d 138 (1972). *See also Nesbitt v. Flaccus,* 149 W Va 65, 138 SE2d 859, 867 (1964); *Tarrell v. Erdmann,* 221 NW2d 504, 507 (Iowa 1974).

agreement may be either express or implied. Defendants also conceded at trial that any such agreement between Mr. McCornack and Mr. Houghton would be binding upon their successors in interest. There also was evidence from which the jury could properly find, in our opinion, that there was "acquiescence" and "consent" by both Mr. McCornack and Mr. Houghton, at least by implication, as contended by defendants to be necessary in such cases.

Defendants contend that the line run by surveyor Brayton was originally intended to be only a "cutting line," which was never registered as a survey. There was evidence, however, from which the jury could have found that both Mr. McCornack and Mr. Houghton regarded that cutting line as a boundary line. Defendants also say that Mr. Houghton was not the owner of the land when that line was pointed out to him by Mr. McCornack. Mr. Houghton testified, however, that it was at the time when he purchased the property that he had his first conversation with Mr. McCornack on that subject.

Defendants cite authorities in support of the contention that any boundary line so established must be "a visible line marked definitely by monuments" at both ends. The instruction approved by both parties at the trial of this case, and which thus became the "law of the case," includes no such requirement. Instead, it speaks of an agreement "fixing a dividing boundary" which "has been marked or has been recognized in the subsequent use of the tracts or when other action has been taken by *either* party in reliance on the agreement." There was testimony in this case that both Mr. McCornack and Mr. Houghton recognized the cutting line as established by the Brayton survey as the boundary line between their properties. Also, the jury could find that Mr. McCornack acted in reliance on that line in his logging operations and that Mr. Houghton acted in reliance on that line when he originally purchased his property.

In addition, there was testimony that this line was "visible" as a result of the logging by Mr. McCornack to the north of that line and that the northwest corner of the Houghton property at the western terminus of that line was also visible as a result of the "square corner" resulting from the McCornack logging on the north and the logging by the Ross brothers on the property west of the Houghton property. Also, the east end of the line was marked by the large spruce tree which was "blazed," according to plaintiffs' testimony, while its western end was marked by a cedar stake. Although that stake was set after the original Brayton survey, there was testimony that it was located at the same point as the "corner" which was "visible" because of the logging to the north and west of that corner, as previously described.

Defendants also cite authorities in support of the contention that "the land [must] be occupied by the landowners subsequent to the location of the line." Again, no such requirement was stated in the agreed instruction which became the "law of the case." Under the terms of that rule it is sufficient, as previously stated, that the agreed upon boundary be "recognized in the subsequent use of the tracts or when other action has been taken by either party in reliance on the agreement." As previously stated, there was testimony from which the jury could properly find that one or the other of these alternative requirements were satisfied.

In addition, defendants contend that under the doctrine of "practical location" it is necessary that "the true line be in dispute, uncertain or indefinite." Similarly, the agreed instruction refers to the fixing of a boundary "the location of which was honestly disputed or was indefinite or uncertain." In support of this contention defendants cite cases in which the "indefiniteness" resulted from a misdescription in deeds and say that in this case the description in the respective deeds were not uncertain; that "it remained only for a competent surveyor to locate the description

[ 269 ]

on the ground"; and that "the dispute, uncertainty or indefiniteness must exist at the time of the location of the property line."

At the same time, defendants concede that "Oregon appears to have taken the liberal view with respect to the extent of the uncertainty that must exist prior to the agreement," citing Note and Comment, 28 Or L Rev 362 (1949), as quoted with approval in *Harris et ux v. Backus et al, supra,* at 710. In that Note and Comment it is stated that:

> "* * * The requirement of uncertainty does not demand that the true boundary be unascertainable; nor does it demand that the true line can be located only with difficulty. It is sufficient if the actual location of the true boundary on the ground is unknown to the parties." 28 Or L Rev at 365.

We believe that the jury could properly find from the evidence in this case that this boundary line was "indefinite or uncertain" based upon evidence that prior to the Brayton survey there were no monuments or other markers on or along the boundary line between the McCornack property and the property immediately to the south later owned by plaintiffs and that both at the time of the Brayton survey and at the time of the subsequent conversations between Mr. McCornack and Mr. Houghton "the true boundary on the ground [was] unknown to the parties."

Finally, defendants contend that plaintiffs are not entitled to rely upon the rule of "boundary by acquiescence" because that rule must be pleaded, citing *Kingsley v. Jacobs,* 174 Or 514, 149 P2d 950 (1944), and *O'Hara v. Brace,* 258 Or 416, 426, 482 P2d 726 (1971). However, no such contention was made by defendants at the time of trial, although defendants attempted to make that contention later in their motion for a judgment n.o.v. It is well established that such a motion cannot be based upon grounds not raised by motion for nonsuit or directed verdict. *Vancil v. Poulson,* 236 Or 314, 320, 388 P2d 444 (1964). Moreover, defendants expressly recognized in their

motion for involuntary nonsuit that "boundary by acquiescence" appeared to be one of the issues in this case, contending only that the evidence was insufficient to satisfy the requirements of that rule. Finally, and of even more importance, defendants later expressly agreed upon the submission of that issue to the jury under an instruction which they agreed upon as a correct statement of the requirements of that rule.

For all of these reasons, we hold that the trial court did not err in denying defendants' motions for nonsuit, directed verdict, or judgment n.o.v.

The judgment of the trial court is affirmed.[4]

---

[4]We have not overlooked defendants' remaining two assignments. As to the first of these assignments, involving alleged error in sustaining an objection to a question asked by defendants on cross-examination, we hold that the trial court did not err in sustaining that objection. As to the remaining assignment, involving the assessment of treble damages, the contention made by defendants in their brief was not made at the time of trial and the further contention made by defendants on oral argument was not made by them either at the time of trial or in their briefs. We therefore decline to consider them.

It should also be noted that the attorneys who prepared appellants' brief and who argued this appeal on behalf of the appellants did not participate in the trial of this case.